Stanley Stahl v. Commissioner.
Stahl v. Commissioner
Docket No. 2145-64.
United States Tax Court
T.C. Memo 1966-94; 1966 Tax Ct. Memo LEXIS 187; 25 T.C.M. (CCH) 505; T.C.M. (RIA) 66094; May 5, 1966
Jerome Kamerman, 11 West 42nd St., New York, N. Y., for the petitioner. Charles M. Costenbader, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined a deficiency in the Federal income tax of the petitioner for the year 1955 in the amount of $134,027.54. The petitioner has not put in issue some of the adjustments made by the statutory notice, and the amount of the deficiency now in dispute is $128,265.77. The sole issue for our decision is whether the Stahl Development Corporation was formed or availed of principally for the construction of property with a view to the sale or exchange of its stock by the petitioner prior to the realization by the corporation of a substantial part of the taxable income to be derived from such property and the realization *188 by the petitioner of gain attributable to such property. Findings of Fact Some of the facts are stipulated and are so found. Stanley Stahl (hereinafter called the petitioner) duly filed his individual Federal income tax return for the taxable year 1955 with the district director of internal revenue for the former upper Manhattan internal revenue district. After graduating from college in 1948, the petitioner worked as a real estate salesman; he saved his money and bought several pieces of property. In 1954 the petitioner purchased the Keith Building in Cincinnati through a real estate brokerage company, Frederick Schmidt, Inc. During 1954 and 1955 the petitioner was an officer and stockholder of the Melart Realty Corporation (herinafter referred to as Melart Realty), which owns an office building in New York City. The petitioner was active and experienced in managing, leasing and selling real estate properties; however, prior to the venture in question he had never been involved in the construction of a building. In October of 1954, Walter Schmidt, who was affiliated with Frederick Schmidt, Inc., telephoned the petitioner and offered him a forty-one acre tract of land on *189 Reading Road in Cincinnati, Ohio. At the time the property was being developed by Woodner Center, Inc., which had hired architects to plan a shopping center on the site. The owner wanted to sell the land quickly for reasons not disclosed by the record. The petitioner and Guilford Glazer (hereinafter referred to as Glazer), a social friend, decided to look at the property The petitioner was interested in getting Glazer's opinion because he had recently completed a shopping center in Tennessee. The petitioner had previously done business with Glazer. After the two men looked at the property the petitioner told Glazer that he thought he could rent space in such a shopping center for double the amount Glazer had obtained for his center in Tennessee. Glazer thought that if this could be done, it would be possible to arrange for a mortgage loan equal to the cost of the land and all the construction. During November of 1954, the petitioner acquired an option to purchase this property which was known as the Swifton Shopping Center (hereinafter referred to as the Swifton Center). Glazer orally agreed with the petitioner to participate in the purchase and development of the project. *190 The petitioner and Glazer agreed to divide their duties so as to best utilize the experience and resources of each man. It was orally agreed that the petitioner would try to obtain long-term leases from major retail chain stores and would also try to secure a permanent first mortgage for the completed center. Glazer, whose family controlled the Sun Construction Company (hereinafter referred to as Sun Construction), agreed to construct the building. Glazer also agreed to handle the interim financing by securing a construction loan from Union Planters Bank (hereinafter referred to as Union Planters), Memphis, Tennessee, where he maintained a large deposit. After acquiring the option on the land, the petitioner retained a law firm in Cincinnati and asked them to form a corporation which would take title to the land. George E. Fee (hereinafter referred to as Fee), the senior partner of such firm, had represented the former owner, Woodner Center, Inc., in its negotiations with prospective tenants. On December 3, 1954, Stahl Development Corporation (hereinafter referred to as Stahl Development) was incorporated with authorized capital of 250 shares of no par capital stock. The petitioner *191 and Glazer each purchased 125 shares of stock for $2,500. [1] The petitioner then assigned his option on the land to the corporation, and on January 13, 1955, Stahl Development purchased the property from Woodner Center, Inc., for $809,255.49. The purchase price included the assumption of a mortgage payable to the Prudential Insurance Company and unpaid local real estate tax assessments. In addition to their respective capital stock purchases and contributions of $2,500 each, the petitioner and Glazer loaned or caused to be loaned to Stahl Development the following amounts: Stanley Stahl
Melart Realty Corporation loan
$122,500
Guilford Glazer
Sun Construction Corporation loan
50,000
Guilford Glazer loan
222,500
There was no written agreement between the petitioner and Glazer about their purchase of the Swifton Center. The two men orally agreed that together they would invest about $250,000 for the purchase of the land, and that Glazer would supply any other financing necessary to acquire the land. In fact Glazer contributed $150,000 more than the petitioner. When *192 they began planning the Swifton Center, the petitioner and Glazer estimated that the land would cost about $800,000 and the building $4,000,000 to $4,200,000. They were planning on a permanent mortgage of $5,500,000 which would leave a cushion of $500,000. Soon after the land was acquired, the petitioner started negotiating for leases with potential tenants. During January, February, and March of 1955 the petitioner spent most of his time in Cincinnati trying to lease space in the center. During this same period the petitioner also began negotiations with several insurance companies, particularly the Massachusetts Mutual Life Insurance Company (hereinafter referred to as Massachusetts Mutual) for the purpose of securing a long-term mortgage to be used as the permanent financing. The petitioner and Massachusetts Mutual reached a tentative agreement under which the insurance company would make available a permanent mortgage when Stahl Development could show signed leases assuring an income sufficient to repay such mortgage. This agreement was for a permanent mortgage to be given after the building was built, and it was conditioned upon almost full occupancy by prime credit tenants *193 under long-term leases. Although the petitioner succeeded in leasing 70 percent of the Swifton Center and thought that he could lease the rest of the space, he had not signed enough tenants to earn a binding commitment for a permanent mortgage from Massachusetts Mutual at the time he sold his stock in Stahl Development. Glazer became active in the project during the spring of 1955. He proceeded with the construction during March and April of that year. On April 16, 1955, Stahl Development and Sun Construction entered into a formal agreement for the construction of the Swifton Center. Soon after this it became necessary to arrange the construction loan. Glazer negotiated a temporary construction loan with Union Planters on or about April 26, 1955, whereby the bank promised to loan to Stahl Development an amount equal to the company's permanent mortgage commitment. This loan had several important provisions. As security for the loan the petitioner and Glazer endorsed their stock in Stahl Development over to Union Planters. Stahl Development was to give its note for the face amount of the loan to Sun Construction, and this note was to be secured by a first mortgage on the Swifton *194 Center. Sun Construction in turn was to endorse this note and mortgage to Union Planters. The petitioner and Glazer personally guaranteed Stahl Development's obligations to Union Planters. Furthermore, if the cost of construction exceeded the amount of Union Planters loan, the petitioner and Glazer were each personally bound to lend one-half of any such excess to Sun Construction, and if either the petitioner or Glazer failed to provide his half, the defaulting party lost his interest in his Stahl Development stock, and it became the property of Union Planters. An important feature of the guarantee was that if one guarantor defaulted and the other did not, the nondefaulting party had the right to purchase the other party's stock from Union Planters. On May 16, 1955, the petitioner as president of Stahl Development executed a mortgage on the property for $5,500,000 to Sun Construction. On the same day Sun Construction assigned this mortgage to Union Planters, pursuant to the planned financing. While negotiating for the construction loan, Glazer along with his brothers Louis and Jerome, advanced $350,000 to Stahl Development to meet current construction expenses. On May 26, 1955, Stahl *195 Development recorded on its books a note payable to Glazer and his brothers for $507,500. The petitioner was aware of this note and that it had been executed by Stahl Development. He may have signed it as an officer of the corporation. By mid-June of 1955, Sun Construction had incurred substantial expenses in planning the construction and had paid a fee of $55,000 to Massachusetts Mutual as a goodfaith deposit for the permanent mortgage of $5,500,000. During this same period differences arose between the petitioner and Glazer. The petitioner was dissatisfied because Glazer failed to consult him before making commitments for fees. Glazer then agreed to send the petitioner regular monthly statements which would keep him informed of the progress on construction. Their differences were composed. Sometime after the construction loan was signed, Glazer informed the petitioner that Union Planters, despite its agreement, was unwilling to proceed with a $5,500,000 loan. Union Planters wanted to cut it to $3,000,000, and wanted collateral or a third party's guarantee in addition to the $5,500,000 mortgage to Sun Construction and the personal guarantee of Glazer and the petitioner. *196 Glazer told the petitioner that his uncle, S. Harry Busch (hereinafter referred to as Busch) would be acceptable to Union Planters, and that he would be willing to guarantee a loan of $3,000,000 provided he could have a second mortgage on the property. Glazer drafted the papers for such an agreement with Busch and sent them to the petitioner for his signature as president of Stahl Development. The petitioner signed the guarantee agreement and second mortgage, and his personal attorney, Solomon Gilbert (hereinafter referred to as Gilbert), mailed them to Glazer on July 15, 1955. Such agreement follows: AGREEMENT This agreement made and entered into this 19th day of July, 1955, by and between STAHL DEVELOPMENT CORPORATION, and Ohio Corporation, hereinafter referred to as the first party, and S. HARRY BUSCH of Knoxville, Tennessee, hereinafter referred to as the second party. WITNESSETH: WHEREAS, the first party is now in the process of constructing buildings in Cincinnati, Ohio to be known as SWIFTON CENTER, and WHEREAS, the Massachusetts Mutual Life Insurance Company has issued its commitment to make a loan to the first party in the principal sum of FIVE MILLION, FIVE *197 HUNDRED THOUSAND ($5,500,000.00) DOLLARS upon completion of all the buildings comprising the said Swifton Center and upon compliance with all the other terms and conditions of said commitment, dated April 25th, 1955, and WHEREAS, the UNION PLANTERS NATIONAL BANK, Memphis, Tennessee, has issued its commitment to the first party to advance funds not to exceed $5,500,000.00 to be used for the erection and completion of said improvements, on condition, among other things, that STAHL DEVELOPMENT CORPORATION shall have fully complied with all of the terms and conditions of the commitment to it from Massachusetts Mutual Life Insurance Company and particularly with respect to the STAHL DEVELOPMENT CORPORATION having executed the necessary tenant leases to make the commitment firm as in said commitment provided, and WHEREAS, the first party has been unable to execute, as of this date, a sufficient number of leases to make the said commitment from Massachusetts Mutual Life Insurance Company firm, but finds it imperative to immediately proceed with the erection and completion of the said buildings so that it can meet its obligations and commitments under the tenant leases already executed, *198 and WHEREAS, under the conditions now existing, the first party has failed to meet the conditions of the commitment from UNION PLANTERS NATIONAL BANK, Memphis, Tennessee, and is therefore unable to procure the necessary interim financing, and WHEREAS, the first party now has been advised by the UNION PLANTERS NATIONAL BANK, Memphis, Tennessee, that before the said Bank will disburse any funds under its commitment, it will be necessary that the first party further secure the said Bank by good and sufficient guaranty to continue in full force and effect until the UNION PLANTERS NATIONAL BANK shall have notified the first party that the necessary number of tenant leases have been executed to make the commitment from Massachusetts Mutual Life Insurance Company firm, and WHEREAS, it is anticipated that the sum of $3,000,000.00 will be needed to meet construction and other costs between the present date and November 15th, 1955, and WHEREAS, the second party is willing and has agreed to guarantee the full payment of a note or notes not to exceed $3,000,000.00 in the aggregate, to be executed by the STAHL DEVELOPMENT CORPORATION to UNION PLANTERS NATIONAL BANK, Memphis, Tennessee (such *199 guaranty to be made either by endorsement or by separate instrument in such form as will meet the requirements of the said Bank) under the terms, conditions and limitations hereinafter agreed upon, NOW, THIS AGREEMENT: That the second party, in consideration of ONE ($1.00) DOLLAR cash in hand paid, and for other good and valuable considerations, receipt of which is acknowledged, does hereby agree for himself, his heirs, executors, administrators and assigns, to guarantee and warrant unto UNION PLANTERS NATIONAL BANK of Memphis, Tennessee, the payment, according to the terms thereof, of a certain note (or notes), the aggregate of which shall not exceed THREE MILLION ($3,000,000.00) DOLLARS, with interest not to exceed five (5%) per cent per annum. IT IS AGREED that this guaranty shall apply to all extensions and renewals of said note, and the second party hereby agrees that said note (or notes) may be extended and renewed from time to time without further notice to or further assent from the second party, except that the maturity of said note shall not be extended beyond December 15th, 1955. THE FIRST PARTY AGREES that it will either pay the said note (or notes) in full at maturity, *200 or at any time thereafter, but not later than December 15th, 1955, or cause the second party to be fully released as guarantor, endorser, or co-maker and from any further liability whatsoever to the UNION PLANTERS NATIONAL BANK at Memphis, Tennessee, or its assignees. In order to secure and indemnify the second party against any loss that he may sustain, as a result of the said guaranty, the first party agrees that it will, simultaneously with the execution of this agreement, execute and deliver to the second party a second mortgage, covering all of the property of the first party, in the form hereto attached and marked Exhibit "A". IT IS FURTHER AGREED and understood that should the first party fail to comply with all of the terms and conditions of this agreement and the mortgage hereinabove-mentioned, or any other agreements made with said Bank in connection with said loan, the second party may, at its option, on 30 days written notice to STANLEY STAHL, take over the construction of said improvements and complete same; for that purpose, the said STAHL DEVELOPMENT CORPORATION hereby assigns to the second party all of its right, title and interest in and to all commitments from *201 Massachusetts Mutual Life Insurance Company and UNION PLANTERS NATIONAL BANK, Memphis, Tennessee, and all other contracts and agreements that the said first party may have with any other person, firm or corporation in connection with the construction and financing of said improvements in order that said second party may have the benefit of all of said commitments and agreements to enable him to complete said improvements and discharge his obligations under the guaranty and for such other purposes as he may deem necessary to protect his interests, all of which shall be subject to the prior rights, if any of the UNION PLANTERS NATIONAL BANK, Memphis, Tennessee, under its loan agreement dated April 26th, 1955, and under the mortgage recorded in Book 2703 at Page 289 in the Register's Office of Hamilton County, Ohio. IT IS FURTHER AGREED and understood that in order to protect his interests the second party shall have, and is hereby given, the irrevocable right, option and privilege to cause the UNION PLANTERS NATIONAL BANK, Memphis, Tennessee, to assign to him the first mortgage above referred to from STAHL DEVELOPMENT CORPORATION to UNION PLANTERS NATIONAL BANK, and the first party *202 does hereby consent to such assignment and agrees to execute all necessary papers that may be required by the Bank for such purposes. It is expressly understood that this agreement shall terminate, and be of no further force and effect, as soon as the first party complies with its commitment with the Massachusetts Mutual Life Insurance Company. In the event that a firm commitment of $5,500,000.00 is not obtained from Massachusetts Mutual Life Insurance Company on or before December 15th, 1955, or a sufficient firm commitment to effect a release of S. HARRY BUSCH from his guarantee, then and in such event it is agreed that STANLEY STAHL may arrange for a second mortgage in sufficient amount so that the total amounts of the said first and second mortgages shall be sufficient to effect the release of the said S. HARRY BUSCH from his said guarantee. The terms of payments on said second mortgage shall be in accordance with the formula set forth in the previous paragraph. STANLEY STAHL shall have 30 days in which to effectuate such mortgage. IN WITNESS WHEREOF, each of the undersigned has caused this instrument to be signed this 19 day of July, 1955. STAHL DEVELOPMENT CORPORATION *203 By: /s/ Stanley Stahl Pres. First Party By: Second Party In his letter of transmittal, Gilbert stated that petitioner's acceptance of and signature upon the agreement were conditioned upon the execution of a modification agreement "as follows:" In consideration of the sum of One ($1.00) Dollar, to each of the parties hereto to the other in hand paid, receipt whereof is hereby acknowledged by each of the parties, and for other good and valuable consideration, it is hereby agreed by and between STAHL DEVELOPMENT CORPORATION, SUN CONSTRUCTION CORPORATION and GUILFORD GLAZER and STANLEY STAHL as follows: 1. That the loan agreement heretofore executed by the said parties in connection with a loan to be made by UNION PLANTERS NATIONAL BANK of Memphis be modified in the following respect: (a) Should the lender therein named (SUN CONSTRUCTION CORPORATION) require funds for completion over and above the principal sum of said agreement, and should the said lender make request of the bank for such additional funds, STANLEY STAHL and GUILFORD GLAZER shall each contribute fifty (50%) per cent of such additional funds, within thirty (30) days after notice and demand for same. (b) *204 Should they or either of them be unable to provide such funds, the said parties hereby agree that they will consent to the corporation (STAHL DEVELOPMENT CORPORATION) obtaining a second mortgage to cover the amount so required for completion of construction. (c) Such second mortgage shall contain terms and conditions of payment which, together with all of the other expenses and carrying charges of the premises, will be less than the rental income of the corporation, to the extent of at least Fifty Thousand ($50,000.00) Dollars per annum. In computing rental income, the fixed minimum rents shall be used, except in connection with the lease to Allied Stores, in which case the annual sum of $123,000.00 shall be used. It is the intention of the parties that such second mortgage shall not exceed the ability of the corporation to meet the payments of same, based on the rentals computed as aforesaid, and leave a reserve of Fifty Thousand ($50,000.00) Dollars in the corporation after payment of expenses and income taxes. 2. In the event that a firm commitment of $5,500,000.00 is not obtained from Massachusetts Mutual Life Insurance Company on or before December 15th, 1955, or a sufficient *205 firm commitment to effect a release of S. HARRY BUSCH from his guarantee, then and in such event it is agreed that STANLEY STAHL may arrange for a second mortgage in sufficient amount so that the total amounts of the said first and second mortgages shall be sufficient to effect the release of the said S. HARRY BUSCH from his said guarantee. The terms of payments on said second mortgage shall be in accordance with the formula set forth in the previous paragraph. STANLEY STAHL shall have 30 days in which to effectuate such mortgage. JULY 19, 1955 STAHL DEVELOPMENT CORPORATION By: /s/ Stanley Stahl Pres. SUN CONSTRUCTION CORPORATION By: / Guilford Glazer /s/ Stanley Stahl / Stanley Stahl The so-called modification agreement was very important to the petitioner because if the total cost of the Swifton Center should exceed $5,500,000, as Glazer then told him it might, he wanted to be able to borrow any additional money. The petitioner could only raise $40,000 to meet his share of any additional costs, whereas Glazer maintained a deposit of $1,000,000 with Union Planters. If the petitioner should prove unable to raise his share of additional construction costs, his stock in *206 Stahl Development would become the property of Union Planters, and Glazer would have the right to buy it. Glazer replied by wire on July 16 that the guarantee contract, second mortgage and modification were entirely unacceptable, and that the money situation was "critical." He also said that if the matter was not resolved by July 20, Sun Construction would stop all work. For the next 10 days Glazer and the petitioner exchanged letters and telegrams. The guarantee agreement and modification agreement were drafted and redrafted, but Glazer continually objected to their form. On July 29 Glazer wrote Gilbert (with copy to petitioner), alleging that it was the petitioner's "obligation to cover his half" of the interim financing. (Glazer had originally promised to handle that part of the venture.) The letter also indicated that Glazer and his two brothers might join Busch in guaranteeing the $3,000,000 loan from Union Planters. There was no indication that they would charge a fee for any such guarantee. At a meeting held early in August of 1955, Glazer requested the petitioner to execute a series of documents including a corporate resolution dated May 26, 1955, which would formally *207 authorize the $507,500 note to Glazer and his brothers, which has been described earlier in these findings. The note had already been issued by Stahl Development sometime prior to July 1, 1955, but there is no evidence that the petitioner had then signed it as president of the company. At this same meeting Glazer asked the petitioner to execute a 10-year Stahl Development note to Busch in the face amount of $310,000 which would be issued to Busch for a consideration of $215,000. The discount of $95,000 was intended to be a bonus to Busch for advancing $215,000 so that the construction could continue. Glazer also asked the petitioner to authorize a note of Stahl Development in the face amount of $310,000 payable to Busch, Glazer and his two brothers. This note was to be a bonus to them for guaranteeing the $3,000,000 construction loan from Union Planters. Fee, whose law firm was counsel for Stahl Development, was present at this meeting. Fee examined the construction contract between Stahl Development and Sun Construction, and he discussed its terms with the petitioner and Glazer. The agreement was a cost plus contract, and it provided for a substantially higher fee then the going *208 rate for similar contracts in Cincinnati. The three men also discussed a premium on the price to be paid for steel purchased from a steel company owned by the Glazer family. The petitioner specifically asked Fee whether he should sign the notes and proposed minutes which Glazer had presented to him. Fee advised petitioner that such bonuses and premiums, especially when paid to the members of a single family, were potentially fraudulent as against future creditors, and emphatically advised the petitioner not to sign the proposed documents and to sever his relationship with Glazer. The next day Fee's firm resigned as counsel for Stahl Development. After the meeting Glazer and petitioner decided that they would end their association. On August 20, 1955, the two men executed a written agreement under which the petitioner was given an option to purchase Glazer's stock in Stahl Development for $252,500. The option expired on September 15, 1955. In addition to buying Glazer's stock the petitioner had to provide Stahl Development with enough money to pay all the debts due to Glazer, his family, and Sun Construction. The actual agreement did not give the total amount to these advances, but *209 Glazer told the petitioner that the figure was around $900,000. In the event that the petitioner failed to exercise his option by September 15, he agreed to sell his stock in Stahl Development for $252,500 to Allied Construction, another corporation controlled by the Glazer family. This option expired on September 20, 1955. In order to exercise his option the petitioner thought that he needed about $1,183,000. Since he personally could raise only about $40,000 in cash, he started to look for a partner to help him buy out Glazer. The petitioner was able to interest several members of the Williams family, who specialized in building shopping centers. They were willing to put up $1,200,000 to acquire Glazer's interest in Stahl Development. The petitioner and the Williams syndicate drafted an agreement on September 9, 1955, providing that the petitioner would assign one-third of his stock in Stahl Development to them for no consideration. Under this arrangement the petitioner would have owned only one-third of the Swifton Center rather than half of it, but he thought it was such a good investment that a minority interest was better than none at all. On September 10, 1955, Glazer *210 sent a letter to the petitioner advising him that the total amount needed to buy him out was $1,599,696.97 plus some contingent items and interest items and an unspecified "Fee to Sun Construction Corporation." The petitioner informed the Williams syndicate of Glazer's demands, and their interest in the project immediately vanished. In the few days remaining before the September 15 deadline, the petitioner tried without success to find other investors. On September 15 the petitioner reluctantly and with no real alternative sold his stock in Stahl Development to Allied Corporation for $252,500. At the time of the sale the Swifton Center was only in the preliminary stages of construction. Glazer and his associates completed the project. When the petitioner formed Stahl Development, he estimated that the Swifton Center would return a cash flow income of $200,000 per year to be split equally by him and Glazer. The petitioner acquired and held his stock in Stahl Development as a long-term investment. Opinion Section 341 [2] of the Internal Revenue Code of 1954 provides that gain from the sale or exchange of stock in a collapsible corporation which, but for *211 section 341 would be taxed as gain from the sale of a capital asset, must be taxed as ordinary income. The section defines a collapsible corporation as a corporation formed or availed of for the construction or production of property, or for the holding of stock in such a corporation, with a view to the sale of such stock by its shareholders or a distribution to its shareholders prior to the realization by the corporation of a substantial part of the taxable income to be derived from such property, and with a view to the realization by such shareholders of gain attributable to such property. *212 The respondent has treated the petitioner's gain on the sale of his Stahl Development stock as ordinary income relying upon section 341. The Commissioner argues that the section covers individual shareholder action as well as corporate action, and that therefore a corporation may be collapsible as to particular shareholders who, apart from corporate policy, or action as such, avail themselves of the corporation for the proscribed purpose. We agree, and numerous cases have so held. See, e.g., Commissioner v. Solow, 333 F. 2d 76 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; Sylvester J. Lowery, 39 T.C. 959 (1963), affirmed 335 F. 2d 680 (C.A. 3, 1964). However, we are convinced from the evidence that the petitioner here did not act with the proscribed view. The respondent's principal argument is that petitioner acted (sold his stock) with the proscribed view because his limited financial resources makes any other conclusion unrealistic. Respondent points to petitioner's total "investment" of $125,000 and his testimony that he could have raised no more than an additional $40,000 from personal resources as the background against *213 which petitioner became a 50 percent participator in a venture originally estimated to cost $5,000,000. Respondent also points to section 1.341-2(a)(2), Income Tax Regs., which provides that the requirement as to the requisite view is satisfied if the later action was contemplated unconditionally or conditionally, or was a recognized possibility. While it is true that petitioner was on thin financial ice, this is not the sole test we are required to apply. Petitioner was an experienced and successful real estate operator and we have concluded from the record that he acquired his stock in Stahl Development as a long-term investment and that his purpose never changed. The petitioner had expected that the completed shopping center would have a cash flow income of $200,000 a year and would be an excellent long-term investment. When the petitioner sold his stock in Stahl Development, his only alternative was to continue in a venture under a contract which paid his associate's construction company a percentage profit nearly twice the going rate in Cincinnati. In addition Glazer was demanding bonuses for loans made by him and his family ranging from $95,000 to *214 $310,000 to finance the Swifton Center's construction, an obligation Glazer had agreed to assume. Competent legal counsel had advised the petitioner "that if something happened to this venture, the creditors would have a real right to complain * * *." Fee also thought that the petitioner "would become personally liable for losses which might be sustained by creditors through Glazer's type of activity." Acting upon this advice, the petitioner decided that he must end his association with Glazer, and signed the buy-sell agreement with him in August 1955. We do not think these are circumstances which petitioner reasonably should have foreseen. Perhaps, naively, the petitioner did not draw this agreement so as to state precisely the total amount necessary to reimburse the Glazer family interests for their loans and outlays but relied on Glazer's statement that the total was "about $900,000." Petitioner's desire and purpose was still to retain an interest in Swifton Center, and to this end he succeeded in interesting members of the Williams family in buying out Glazer for $1,200,000. Under this arrangement the petitioner would have sold none of his stock and would have retained a minority *215 interest of 33 percent in Stahl Development. Only five days before the deadline Glazer told the petitioner that his price was $1,599,696.97, plus several additional items, the largest of which was the "fee" to Sun Construction. [3] When informed of this, the Williams syndicate lost interest. After being unable to find a new investor, the petitioner reluctantly sold his stock in Stahl Development. We conclude and hold that the petitioner has proved the "compelling facts" required by section 1.341-2(a)(3), Income Tax Regs., [4] and that he did not form Stahl Development nor did he sell his stock in such company with a view toward realizing gain from the construction of the Swifton Center prior to the realization by the corporation of a substantial part of the taxable income to be derived from said shopping center. The petitioner sold his stock only because he had no realistic alternative and because of circumstances *216 beyond his control. Sylvester J. Lowery, supra; Commissioner v. Solow, supra.
We think the petitioner did not sell his stock with the freedom of choice contemplated by section 341. The petitioner's free choice in the instant case was as effectively foreclosed by the potentially fraudulent actions of Glazer, as was true in Sylvester J. Lowery, supra, where the taxpayer sold his stock only because he could not raise the additional capital needed by the company to complete construction. Also cf. Shilowitz v. United States, 221 F. Supp. 179 (D.N.J. 1963) and Maxwell Temkin, 35 T.C. 906 (1961). Decision will be entered under Rule 50. Footnotes
1. The price was $4 per share plus contributions to stated capital of $16 per share.↩
2. SEC. 341. COLLAPSIBLE CORPORATIONS. (b) Definitions. - (1) Collapsible Corporation. - For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, * * * or for the holding of stock in a corporation so formed or availed of, with a view to - (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), * * * before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property.↩
3. There is insufficient evidence to determine if Glazer was justified in asking for $1,599,696.97. However, it is undisputed that Glazer had told the petitioner his price was $252,500 for his stock plus "about $900,000" for his family's advances.↩
4. It is undisputed that the sale of petitioner's stock took place before completion of construction.↩