COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Ralph J. SOLOW and Celia O. Solow, Respondents.

No. 375, Docket 28603.

United States Court of Appeals
Second Circuit.

Argued April 15, 1964.

Decided June 9, 1964.

---

1. Defendant specifically requested that the issue not be submitted as a factual issue to the jury.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Fred R. Becker, Attys., Dept. of Justice, for petitioner.

Mason G. Kassel, New York City, for respondents.

Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

The question raised by this petition is whether profits realized in 1950 from the sale of certain corporate stock should be taxed at capital gains rates, or whether Section 117(m) of the Internal Revenue Code of 1939, as amended by Section 212 of the Revenue Act of 1950, 64 Stat. 906,[1] in force at the time of the relevant sale and which prescribes special tax treatment for income realized through the use of the device of a "collapsible" corporation, requires that the profits be taxed as ordinary income. The Tax Court determined that capital gains treatment was in order and the Commissioner seeks review of this determination. We affirm the Tax Court.

Taxpayer, Ralph J. Solow,[2] agreed with one Sarner, in early 1947, to embark upon the financial venture of constructing an apartment project. According to this agreement taxpayer was to contribute funds and arrange for credit and Sarner was to contribute funds and supervise construction. Two corporations, the Sarner and Solow Construction Co. and Teaneck Gardens, Inc., were organized by taxpayer and Sarner in April of 1947 to construct and own the project. Each corporation issued 100 shares of common stock, with 50 shares going to Sarner, 49 to the taxpayer, and the other share to an attorney for taxpayer's benefit. The apartment project, which was named Teaneck Gardens, was completed in November of 1948; and from that time through August of 1950, when taxpayer agreed to sell his Teaneck Gardens stock to Sarner, the project was completely rented and had a full waiting list. Teaneck Gardens was never listed for sale during that period, and though a broker a number of times attempted to effectuate a sale, neither taxpayer nor Sarner was interested in selling.

While Teaneck Gardens was still in its construction stage, taxpayer and Sarner, in 1948, decided to build another apartment project, and to that end they caused to be organized in February of 1949 Linwood Park, Inc., a corporation whose 100 shares of stock were distributed in a manner identical to that of the two corporations which had been previously organized to carry out the Teaneck Gardens venture. In September of 1949, thirteen additional corporations, named Linwood Park, Inc., Sections 1 through 13, were organized, each of which was to construct and own a five-story apartment within an apartment project to be called Linwood Park. Each of the corporations issued 50 shares of stock, which were dis-

---

1. This section was carried over without substantial change into Section 341 of the Internal Revenue Code of 1954.

2. Celia O. Solow is a party to these proceedings only because she filed a cash basis joint return with her husband for the year involved.

tributed as follows: 25 shares to taxpayer, 24 shares to Sarner, and one share to an attorney holding for Sarner's benefit.

Construction of the Linwood Park project progressed without serious difficulty until March or April of 1950, when disagreement developed between taxpayer and his colleague Sarner. Sarner began to demand that he receive a two-thirds interest in a shopping center which had been proposed for the project, claiming that his status as a builder entitled him to it, and he also began to demand that the project be managed, for a fee, by a management corporation wholly owned by him. Taxpayer refused to accede to Sarner's demands, and the relationship between the two, which had been amicable until that time, became difficult and unfriendly.

Strife between taxpayer and Sarner reached its peak in June of 1950, when an incident occurred involving certain checks drawn on the accounts of several of the corporations owned by the two men. Taxpayer, on a visit to the Linwood Park project, was requested by Sarner to sign some blank checks which Sarner said were to be used in paying bills. Since the signing of blank checks in advance was not unusual in taxpayer's and Sarner's operations, taxpayer complied with Sarner's request. Sarner then renewed his demands relative to ownership of the proposed shopping center and management of the apartment project, a heated argument ensued during the course of which taxpayer unequivocally refused to agree to Sarner's proposals, and Sarner threatened to "dump" the entire project. Petitioner left the project site and matters remained unresolved. Sarner later caused seven of the signed blank checks to be filled in naming himself as payee for sums totaling $685,540. The checks contained a notation indicating that they were for "services as per agreement above construction cost," but no such agreement had been entered into and the notations had not been on the checks when taxpayer had signed them in blank. Fortunately for taxpayer he

became concerned about the blank checks, and, after investigating the matter, caused payment on the checks to be stopped. He was also able to retrieve the remaining signed blank checks.

Several conferences thereafter ensued between taxpayer, Sarner, and their respective attorneys and accountants, but efforts to effect some sort of reconciliation proved unsuccessful. Later, after Sarner had rejected a proposal by taxpayer that the two divide their holdings equally, taxpayer offered to purchase Sarner's interests. Sarner "became excited and stated that no one was going to buy the project, except himself," and "averred that if he could not buy the properties, he would cause financial ruin." In the face of this threat, and mindful of his personal liability on several indemnity agreements executed for the benefit of the Linwood project corporations, taxpayer "reluctantly agreed" on or about June 22, 1950, to sell to Sarner all his interests in the relevant ventures if a fair price and fair conditions could be agreed upon. On July 31, 1950, taxpayer and Sarner arrived at a price of $1,333,333 for all of petitioner's interests, and, on August 29, 1950, final terms as to conditions of payment were agreed upon and a contract executed. Taxpayer received $650,000 cash and a promissory note for the balance of the purchase price, and he resigned as an officer and director of all the relevant corporations except Linwood Park, Inc. and Linwood Park, Inc., Sections 1 through 13. He continued as an officer and director of these corporations for security purposes only, with his resignations deposited with an escrow agent, until September 15, 1950, when the balance of the agreed purchase price was paid him.

Section 117(m) of the 1939 Code provides that gain from the sale or exchange of stock of a "collapsible" corporation, which, but for Section 117(m) would be taxed as gain from the sale of a capital asset, must be taxed as ordinary income. The section defines a "collapsible" corporation as a corporation formed or availed of for the construction or production of

property, or for the holding of stock in such a corporation, with a view to the sale of stock by its shareholders or a distribution to its shareholders prior to the realization by the corporation of a substantial part of the net income to be derived from such property, and with a view to the realization by such shareholders of gains attributable to such property.[3]

The Tax Court held that, as regarded the sale of taxpayer's stock in Teaneck Gardens, Inc., that corporation was not within the purview of Section 117(m) because the Teaneck Gardens project had been completed prior to the taxpayer's formulation of a view to sell, see Braunstein v. Commissioner, 305 F.2d 949, 951 (2 Cir. 1962), aff'd with grant of certiorari limited to another question, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963), and because the "circumstances which caused the eventual sale could not reasonably have been anticipated." The Commissioner has elected not to question this determination in proceedings before this court, and instead has expressly limited his appeal to that portion of the Tax Court's decision which relates to taxpayer's sale of stock in the remaining corporations. Though the completion dates of the projects of these corporations were never determined below, the Tax Court also held them not to be collapsible within the meaning of Section 117(m), on the ground that taxpayer was

never in a position to determine the policies of these corporations, and Sarner, who was able to and did exercise such control, never entertained a view to sell.

The Commissioner, directing attention to those portions of Section 117 (m) which extend the section's coverage to individual shareholder action as well as to action taken pursuant to corporate decision, and which, for that reason, indicate that a corporation may be collapsible as to particular shareholders who, apart from a corporate policy, avail themselves of the corporation for the purposes proscribed by the section, urges that the Tax Court erred in turning its decision on the issue of corporate control; and the Commissioner further argues that, at any rate, the Tax Court committed clear error in determining that taxpayer was unable to control and direct the policies of the corporations. We find, however, that it is unnecessary to decide the questions raised by the arguments of the Commissioner because, apart from the matter of corporate control, it is clear beyond doubt that the coercive circumstances which brought about the sale preclude a finding that the taxpayer acted with the "view" required by Section 117(m).

Taxpayer at no time indicated, prior to the open break between him and Sarner, that he desired to sell his interests in any of the corporations, and both he and Sarner had resisted several efforts

3. The section provides, in relevant part, as follows:

§ 117(m)—

"(1) Treatment of gain to shareholders.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions.—

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed

of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property. * * *"

[As added by § 212(a) of the Revenue Act of 1950, c. 994, 64 Stat. 906, 26 U.S. C.A. § 117(m).]

by a broker to induce them to sell the Teaneck Gardens project. Moreover, even after Sarner's abortive attempt to convert corporate funds to his own use, taxpayer attempted to retain his corporate holdings by offering either to buy out Sarner or to divide equally with him the properties held by their various corporations. Only after Sarner rejected this offer, and threatened to ruin taxpayer financially if he, Sarner, could not buy out taxpayer, did taxpayer, in the words of the Tax Court, "reluctantly agree" to sell his stock to his erstwhile colleague.

Whether or not the "view" required by Section 117(m) must be formulated prior to the completion of the construction of property by the corporation, compare, e. g., Braunstein v. Commissioner, supra, with Glickman v. Commissioner, 256 F.2d 108, 111 (2 Cir. 1958) (dictum), it is clear that the section does not contemplate a ruling that the necessary view may be present under circumstances where a shareholder, with no previous design or thought to sell his stock, reluctantly agrees to sell because he must. Where individual stockholder action, as opposed to action directed by the corporation itself, is sought to be used as a basis for characterizing a corporation collapsible as to the acting shareholder, that shareholder must at least have been possessed of some reasonable degree of free choice in determining whether to act. A shareholder suddenly ordered to sell under threat of financial ruin, by one reasonably in a position to make good on the threat, is certainly possessed of no greater degree of free choice than a shareholder who must sell because of sudden illness, see Shilowitz v. United States, 221 F.Supp. 179 (D.N.J. 1963), Temkin v. Commissioner, 35 T.C. 906 (1961), and he is possessed of even less freedom of choice than a shareholder who feels he is required to sell to obtain funds to cover the costs of separate business ventures which require financing, see Riley v. Commissioner, 35 T.C. 848 (1961).

The Commissioner claims, however, that we must remand this case to the Tax Court, so that that court can make an independent determination on the issue of whether taxpayer's stock was sold with the view required by Section 117(m). We do not agree. Though the Tax Court made no express finding on the ultimate fact of the existence or nonexistence of the required view, the basic facts found by that court permit of only one conclusion. There is no legitimate reason for remanding this case to the Tax Court on the off-chance that that court might, in a decision which we must regard as highly improbable, make a finding which we now know we would be compelled to reverse as clearly erroneous. Cf. Ber v. Celebrezze, 332 F.2d 293 (2 Cir. May 25, 1964).

Affirmed.