COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Sylvester J. LOWERY and Rosemary P. Lowery, Respondents.

No. 14699.

United States Court of Appeals
Third Circuit.

Argued April 9, 1964.

Decided Aug. 18, 1964.

Fred D. Becker, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

Joseph F. McVeigh, Philadelphia, Pa., for respondents.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

The issue presented is whether gains realized by the taxpayer [1] in 1951 and 1952 from the sale of his stock in two corporations, Parkway House, Inc. ("Parkway") and Raleigh Construction Company ("Raleigh") were taxable as ordinary income pursuant to section 117 (m) of the Internal Revenue Code of 1939,[2] relating to collapsible corporations.

---

[1.] Rosemary P. Lowery is a party only because she filed joint tax returns with her husband, Sylvester J. Lowery for the taxable years involved.

[2.] (Now § 341 Int.Rev.Code of 1954).
 "§ 117.   *Capital gains and losses*
 \* \* \*
 "(m) *Collapsible corporations.*
 "(1) *Treatment of gain to shareholders.* Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection)

as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset
 "(2) *Definitions.*
 "(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property

The stipulated facts, found by the Tax Court, may be summarized as follows:

Taxpayer's principal occupation is that of a "Builder". In 1949 he had been associated with E. J. Frankel ("Frankel") in the building of an apartment project in Collingswood, New Jersey. Frankel had supervised the actual construction of that project and taxpayer had arranged for the Federal Housing Administration ("FHA") commitment. Thereafter, in January, 1950, Frankel was instrumental in organizing Parkway for the purpose of constructing a luxury apartment house in Philadelphia, and because of his earlier successful association with taxpayer he permitted taxpayer to participate in this project. On October 18, 1950, taxpayer purchased for $750 a 30% interest in Parkway, receiving 75 shares of $10 par value stock out of the corporation's authorized capital of 250 shares. Parkway was initially financed by means of a conventional mortgage and taxpayer's special ability and knowledge with respect to FHA mortgages was not required.

After the actual construction of the project was approximately 50% completed, Frankel determined that certain improvements in the building were desirable, including complete air-conditioning. He advised taxpayer that the project would cost approximately $700,-000 more than the invested capital and mortgage proceeds and an additional investment on the part of the shareholders would therefore be required. Taxpayer was not in a position to advance the additional funds, nor did he desire to do so. Frankel then informed taxpayer that he had contacted two people who were willing to advance a portion of the needed funds on the condition that they obtain an equity interest in the corporation. On August 29, 1951, at about the time the project was 50% complete, taxpayer sold his 75 shares in Parkway for $45,000. Frankel did not sell his interest in Parkway. On his 1951 income tax return taxpayer reported $44,250 gain on the sale of his stock as long-term capital gain.

About one month after the organization of Parkway, Raleigh was organized under the laws of New Jersey with an authorized capital of 100 shares of no par value common stock for the purpose of constructing the Warwick Apartments, another luxury apartment development. All of the authorized shares of Raleigh were issued for $10 per share as follows:

| Shareholder | No. of Shares | Percent |
|---|---|---|
| S. J. Lowery | 40 | 40 |
| E. J. Frankel | 40 | 40 |
| Frank Steinberg | 13 | 13 |
| Nate Margolin | 7 | 7 |

At the time of Raleigh's incorporation, the shareholders also organized a subsidiary corporation known as Raleigh, Inc., which owned the project (Warwick Apartments), and all the stock of Raleigh, Inc., was owned by Raleigh.

Taxpayer successfully undertook to obtain an FHA insurance commitment for this project. Construction loans totalling $2,489,000 were obtained from the Irving Trust Co. of New York, although, as a condition to advancing this sum, the shareholders were required to execute an FHA indemnity agreement of approximately $235,000 to insure compliance with the requirements of the building loan agreement. Construction of the project was begun in the early part of 1950 and it was substantially completed by July, 1951, at a cost of about $2,755,-274. The excess cost over construction loans and invested capital was approximately $265,374.

---

described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—
"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and
"(ii) the realization by such shareholders of gain attributable to such property."

Frankel advised the shareholders that because of the excess cost additional funds would be needed. Although the corporation attempted to secure additional bank loans, it was only successful in obtaining $100,000 from this source. Taxpayer thereupon advised Frankel that he was unable to advance any additional funds to the corporation.

Sometime in August of 1951, Frankel informed taxpayer that Morris Hassel ("Hassel") would be willing to advance the needed funds provided he received a substantial interest in Raleigh. After a meeting with Hassel, it was agreed that taxpayer would receive $151,500 for his shares.

On October 23, 1951, all the shareholders of Raleigh, including taxpayer, entered into an agreement the purpose of which was to give Frankel and Hassel each a 43% interest and Steinberg a 14% nonvoting interest. Hassel thereupon advanced $360,000 to the corporation and received a corporate note as security. On the same date taxpayer borrowed $140,-000 from Raleigh at 4% interest, giving his 40 shares of stock as security. On January 31, 1952, Raleigh purchased taxpayer's shares for the $151,500 previously agreed to by cancelling the $140,000 loan and paying him $9,981.17, the difference between the agreed purchase price and the $140,000 loan together with interest of $1,518.83. Raleigh also agreed to indemnify taxpayer in case of any loss due to taxpayer's previous endorsement of the construction loans.

Taxpayer reported $149,981.17 gain on the sale of his stock in Raleigh in his 1952 return as long-term capital gain. At the time of the stock sale Raleigh and its wholly owned subsidiary, Raleigh, Inc., had realized gross income of approximately $300,000, of which more than $250,000 represented rental income from apartment leases, although the combined income tax return of the two corporations indicated a loss in excess of $100,000, more than $80,000 of which was attributable to depreciation.

Frankel retained his interest in Raleigh for more than three years.

The Tax Court found "Neither corporation was availed of 'with a view to' the action described in section 117(m) (2) (A), by those owning a majority of the stock and controlling its policies" and, that "Neither corporation was collapsible or was in fact ever collapsed." It held that "section 117(m) was not intended to apply where, as here, a minority stockholder is compelled, because of circumstances over which he had no control, to dispose of his investment in a corporation which is thereafter continued in operation by the majority stockholders", and "Accordingly, * * * neither Parkway nor Raleigh was a collapsible corporation within the meaning of section 117(m)," and thus the taxpayer had correctly reported his profits from the sale of his corporate stock holdings as capital gains. 39 T.C. 959, 969–970 (1963).

The Tax Court did not determine whether taxpayer, at the time he sold his stock, "did so 'with a view to' the action proscribed by section 117(m) (2) (A)," stating on that score that it was unnecessary to make such a determination "in view of our disposition of the issue relating to the sale of his stock * * * as a minority stockholder." 39 T.C. 970.

Section 117(m) was added to the revenue laws in 1950 to frustrate use of the "collapsible" corporation device to convert ordinary income into long-term capital gain.[3] It provides that gain from the sale or exchange of stock of a "collapsible" corporation, which, but for section 117(m) would be taxed as gain from the sale of a capital asset, must be taxed as ordinary income. The section defines a "collapsible" corporation as a corporation "formed or availed of" for the construction or production of property, or for the holding of stock in such a corporation, "with a view to" (1) the sale or exchange of stock by its owners, or a distribution to them, prior to the realization by the corporation of a substantial

---

3. Braunstein v. Commissioner, 374 U.S. 65, 71, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963).

part of the net income to be derived from such property, and (2) the realization by such shareholders of gains attributable to such property. The "view" with which a corporation is used must be a view entertained at the time of such use.[4]

In the instant case the Commissioner urges that the Tax Court erred both in considering the "view" of those controlling Parkway and Raleigh, and in failing to determine the "view" of the taxpayer.

He further contends (1) section 117 (m) applies to any stockholder who owns ten per cent or more of the stock of a corporation and sells his shares, irrespective of whether he controls the policies of the corporation; (2) assuming arguendo (as the Tax Court held) that the statute is inapplicable to a selling stockholder who is not in a position to control the corporation's policies, that "the Tax Court erred in holding that taxpayer was not one of several selling shareholders who could collectively determine the policies of the corporation"; and (3) "the taxpayer must have had the 'view' required by the statute" since "he must have contemplated the mid-construction sale of his stock as one of the possible alternatives if the need for additional funds in fact materialized."

We find it unnecessary to discuss the Commissioner's contentions that the Tax Court premised its decision on the issue of corporate control and the "view" of those exercising such control and that it applied improper standards of law in reaching it. The Tax Court made the fact-finding that the taxpayer was compelled to sell because of circumstances beyond his control, and, since we cannot say that it was clearly erroneous, it precludes a finding that the taxpayer acted with the "view" proscribed by section 117 (m).

▬ We are of the opinion that section 117(m) contemplates a freedom of choice in reaching a decision to sell stock in determining whether a shareholder had the "view" proscribed by the section, and that where a sale is compelled by circumstances beyond control the "view" does not exist.

Our view is in accord with that recently expressed by the Second Circuit in Commissioner v. Solow, 333 F.2d 76, decided June 9, 1964. There the taxpayer, who with one Sarner shared equal ownership of stock of a corporation which was engaged in the construction of apartment houses, sold to Sarner when the latter threatened to ruin him unless he did so.

In affirming the Tax Court's decision that the corporation was not a collapsible one the Second Circuit said:

"* * * it is clear that the section does not contemplate a ruling that the necessary view may be present under circumstances where a shareholder, with no previous design or thought to sell his stock, reluctantly agrees to sell because he must. Where individual stockholder action, as opposed to action directed by the corporation itself, is sought to be used as a basis for characterizing a corporation collapsible as to the acting shareholder, that shareholder must at least have been possessed of some reasonable degree of free choice in determining whether to act. A shareholder suddenly ordered to sell under threat of financial ruin, by one reasonably in a position to make good on the threat, is certainly possessed of no greater degree of free choice than a shareholder who must sell because of sudden illness, see Shilowitz v. United States, 221 F. Supp. 179 (D.N.J.1963), Temkin v. Commissioner, 35 T.C. 906 (1961), and he is possessed of even less freedom of choice than a shareholder who feels he is required to sell to obtain funds to cover the cost of separate business ventures which require financing, see Riley v. Commissioner, 35 T.C. 848 (1961)."

4. Jacobson v. Commissioner, 281 F.2d 703, 705 (3 Cir. 1960).

Like the taxpayer in Solow who was forced to dispose of his stock in order to avoid financial ruin, and the taxpayer in Shilowitz whose heart attack made sale of his corporate interest imperative, the taxpayer here was compelled to sell his stock by events beyond his control. His free choice in determining whether to retain or dispose of his shares was effectively foreclosed by the requirements of Parkway and Raleigh for additional capital investment. Thus, the "view to sale", required by section 117(m), was not present. Lacking that element, neither Parkway nor Raleigh could be deemed "collapsible".

For the reasons stated the decision of the Tax Court will be affirmed.