JOSEPH M. CROWE AND KATHRYN K. CROWE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2436–72. Filed April 30, 1974.

*William H. Leedy* and *William K. Waugh III*, for the petitioners.
*Kenneth W. McWade*, for the respondent.

STERRETT, *Judge:* The respondent determined a deficiency of $43,240.09 in the Federal income taxes of petitioners for the calendar year 1966. The sole issue for decision is whether the gain on the sale of stock of Rayburn Land Co. is taxable as ordinary income under the provisions of section 341, I.R.C. 1954,[1] or as long-term capital gain.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Joseph M. Crowe and Kathryn K. Crowe are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in St. Louis, Mo. They filed their joint Federal income tax return for the calendar year 1966 with the district director of internal revenue at Austin, Tex. Kathryn K. Crowe is a party to this action solely by virtue of having filed a joint return and, consequently, Joseph M. Crowe will hereinafter be referred to as the petitioner.

Prior to 1962 and following graduation from college, petitioner was engaged in the investment banking business in Kansas City, Mo. In 1962 petitioner, because of his municipal bond underwriting activities, became associated with the Crystal Bay Development Co. (hereinafter Crystal Bay) located in Reno, Nev. Crystal Bay was engaged in the construction and promotion of resort property located on Lake Tahoe. Petitioner advised Crystal Bay with respect to the creation of a political subdivision which could issue municipal bonds and, as an investment banker, obtained commitments from several investment banking houses, including the one in which he was a principal, to market approximately $5,500,000 in municipal bonds for the development.

After marketing these bonds, petitioner severed his relationship with the investment banking firm in Kansas City and remained at Lake Tahoe as a municipal bond and financial consultant to assist Crystal Bay in meeting its obligations on these bonds.

Because of financial difficulties, Crystal Bay was recapitalized and in November 1962 petitioner purchased the stock of one of its shareholders who did not wish to be part of the recapitalization. In May 1968 the stock of Crystal Bay, including that of the petitioner, was acquired by Boise Cascade, Inc., in exchange for its stock.

While living in Nevada and working with Crystal Bay, petitioner in late 1963 or early 1964 met several officers of subsidiaries of Time, Inc. (hereinafter Time), who were interested in the financing behind and the development of the resort area by Crystal Bay. At their request petitioner, together with Ray Smith, a land consultant, did a feasibility study for Time of a proposed resort development at Sam Rayburn Lake, Tex.

After the feasibility study was completed, representatives of Time approached petitioner to see if he wanted to be part of the management team for the Time project at Sam Rayburn Lake. Petitioner made four different proposals to Time regarding his participation in the development project, the first in August 1964.

After negotiations at several meetings petitioner and Charles L. Stillman (hereinafter Stillman), chairman of finance for Time, agreed upon the petitioner's participation in the development project. It was

determined that, in return for 50-percent stock ownership by each party, the petitioner and Time would each invest $50,000 in the Rayburn Land Co. (hereinafter Rayburn), formerly Evadale Manufacturing Co., a dormant corporation wholly owned by Time. Time agreed to cause its subsidiaries to sell Rayburn 1,000 acres of land at Sam Rayburn Lake for $250,000 and to grant Rayburn an option to purchase an additional 13,000 acres in an adjacent tract for $1,000 an acre. A purchase-money mortgage would be, and was, executed by Rayburn providing for principal payments to be made out of the proceeds from the sale of lots in the 1,000-acre tract with appropriate partial releases as and when the respective lots were sold. Time further agreed that it or one of its subsidiaries would guarantee a line of credit for Rayburn in the amount of $150,000.

Some of these agreements represent proposals made by the petitioner, and some of the proposals agreed to were dictated by Time. In addition to the above-mentioned agreements, Time required, over the petitioner's objections, that petitioner enter into a shareholder agreement with Time whereby Time, through the exercise of a unilateral option, could reacquire the petitioner's (or his transferee's) stock in Rayburn for a predetermined, but escalating, price during the first 5 years of the agreement as follows:

| | | | |
|---|---|---|---|
| 1st year | $250,000 | 4th | $625,000 |
| 2d | 350,000 | 5th | 750,000 |
| 3d | 500,000 | | |

After this time period, either party could set a price for his stock and the other party would be required either to purchase or sell that amount of stock for the price set by the first party. Petitioner did not want to give the aforementioned unilateral option to Time, but he did so because he believed he had no alternative if he wished to participate in the project. If any option was necessary, the petitioner would rather have had the latter mentioned option operative for the entire time in place of the unilateral option granted to Time for the first 5 years.

The unilateral option was insisted upon by Time because it was tying up a substantial amount of assets, in addition to guaranteeing a line of credit, and it wanted to be sure that it could regain complete control of Rayburn in case of any disagreement with, embarrassment by, or incompetence of the petitioner in handling the project. From his discussions regarding this option with Stillman during the negotiations, petitioner believed, as a result of statements to that effect, that Time would not exercise its unilateral option, and also understood that Time was not concerned about the amount of money the petitioner could make as a shareholder in the project.

The above-mentioned shareholder agreement was entered into by the petitioner and Time on June 29, 1965. On June 30, 1965, petitioner purchased from Time 500 shares of the outstanding 1,000 shares of Rayburn for $50,000. After this sale Time and petitioner each owned 500 shares of Rayburn and each had contributed $50,000 as capital. Petitioner's stockholding in Rayburn entitled him to elect half of its directors. Also on June 30, 1965, petitioner became president, general manager, and a director of Rayburn with an annual compensation as president of $24,000.

The proposed activities of Rayburn included, but were not limited to, development and improvement of real property including the construction of hard surface roads, a water system, utilities, a golf course, country club, swimming pool, private club, marina, gun club, riding stable, motel, commercial development, resort hotel, shopping center, airstrip, and homebuilding.

In 1965 and 1966 Rayburn was engaged in the development and sale of lots in what was termed as "Phase I" of its proposed overall development, which phase consisted of development of the 1,000 acres owned by Rayburn. Rayburn's activity in Phase I consisted of subdividing and filling plots. Approximately 25 to 35 percent of this 1,000-acre tract was plotted during the petitioner's tenure with Rayburn. During the petitioner's tenure approximately 30 percent, or 300 acres, of Phase I was developed with the majority of construction work thereon, including the building of roads and the extension of sewers, completed although that percentage was not then sold. The 1,000-acre tract and improvements, which constituted Phase I of the development was carried on Rayburn's balance sheets for the years 1965 and 1966 as "Real Estate Held For Resale."

While petitioner projected a gross profit potential of approximately $15 million for the entire 14,000 acres, Rayburn reported losses on its 1965 and 1966 (for the short taxable year January 1 to August 31, 1966) corporation income tax returns with sales through August 31, 1966, of $88,261.

After Rayburn actively began doing business, relations between the petitioner and certain directors of the company began to deteriorate. By April 1966 there was a split over the operational and developmental policy of Rayburn between the petitioner's directors and the directors representing Time, who were employees of Time or Time's subsidiaries in the area. Petitioner complained to Stillman about his lack of central authority and indecision by Rayburn's board of directors and eventually tendered his resignation as president of Rayburn. However, such resignation was not acted upon and the petitioner continued as president and as a director.

By August 1966, petitioner believed the project in its entirety was losing momentum, a factor the petitioner considered disastrous. At that time petitioner believed he must gain control of the project so that it could be developed in the manner he believed was proper. Petitioner then delivered to each member of Rayburn's board of directors a letter dated August 18, 1966, wherein he made the following statement:

In my opinion, the situation has evolved to the point where one of three things has to happen. They are, in my order of preference:

(1) Messrs. Buckley, Crawford, and Decker completely disassociate themselves from Rayburn Land Company. I would like Mr. McDonald to stay if he will.

(2) Time Incorporated would set a firm price for two weeks at which they would be willing to sell their half of the stock to me.

(3) Time Incorporated buys my stock at the option price. This project can work without me. * * *

On August 31, 1966, Time exercised its option to purchase the petitioner's shares in Rayburn for the sum of $350,000. At a time prior to the exercise of the option contained in the shareholder agreement, the petitioner sold 6 percent of his stock interest in Rayburn to Glen Kirby and 6 percent thereof to W. L. Lovett. On exercise of the option petitioner received $308,000 for his remaining stock interest.

After the exercise of the option, Time continued to operate Rayburn while owning 100 percent of its outstanding shares. Following the purchase of his stock interest by Time, petitioner was not in any manner affiliated with either Rayburn or Time as an employee, officer, stockholder, director, debtor or creditor, or in any other relationship.

On his 1966 Federal income tax return petitioner reported a long-term capital gain of $264,180 on the sale of his Rayburn stock. In his notice of deficiency the respondent determined that Rayburn was a collapsible corporation as defined in section 341 and consequently the profit on the sale of the Rayburn stock was taxable to petitioner as ordinary income.

### OPINION

The sole issue presented requires our determination as to whether the Rayburn Land Co. was a collapsible corporation within the meaning of section 341.[2] As applicable to the instant case, a collapsible corporation is defined in section 341(b)(1) as a corporation formed or

---

[2] SEC. 341. COLLAPSIBLE CORPORATIONS.

  (a) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from—

    (1) the sale or exchange of stock of a collapsible corporation,

    \*      \*      \*      \*      \*      \*      \*

to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as

availed of principally for the construction of property with a view to the sale of stock by the shareholders prior to the realization by the corporation of a substantial part of the taxable income to be derived from such property, and the realization by such shareholders of gain attributable to such property.

Time wished to develop certain real estate owned by some of its subsidiaries and located at Sam Rayburn Lake, Tex., and, to this end, it invited petitioner, because of his prior experience, to become part of the management team for this development project. The petitioner and Time each invested $50,000 in the Rayburn Land Co. in return for all the latter corporation's stock, one-half going to each party.

Since Time or its subsidiaries were tying up a substantial amount of assets, in addition to guaranteeing a line of credit for Rayburn, Time required, before permitting the petitioner to purchase a half interest in Rayburn, that he grant Time a unilateral option to purchase all of his stock for a predetermined, but escalating, price for the first 5 years in case of any disagreement with, embarrassment by, or incompetence of the petitioner. The petitioner then became president, general manager, and a director of Rayburn. He continued in those positions until, after a series of disagreements over operational and developmental policy between himself and Rayburn's directors representing Time's interests, Time exercised its option to purchase his shares during the second year of the development project.

otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.

(b) DEFINITIONS.—

(1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.

(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

(A) it engaged in the manufacture, construction, or production of such property to any extent,

    *     *     *     *     *     *     *

(3) SECTION 341 ASSETS.—For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is—

    *     *     *     *     *     *     *

(B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business;

    *     *     *     *     *     *     *

In determining whether the 3-year holding period specified in this paragraph has been satisfied, section 1223 shall apply, but no such period shall be deemed to begin before the completion of the manufacture, construction, production, or purchase.

In support of his position that Rayburn was not a collapsible corporation, petitioner makes the following arguments: (1) That the property held by Rayburn was not of the character covered by section 341; (2) that the sale of stock included within the scope of section 341 must be to outside interests rather than to existing shareholders as took place here; and (3) that the proscribed view did not exist in the instant case because the petitioner's sale of stock did not occur with the freedom of choice contemplated by section 341 but rather was compelled by circumstances beyond his control. The respondent, obviously, takes the opposite view on each of these contentions.

The petitioner first contends that the property held by Rayburn was not of the character covered by section 341. However, he has not presented any argument, other than to state the contention, to support that position. On the basis of Rayburn's proposed plan for the extensive development of its real estate and its activities during the petitioner's tenure, including the actual subdividing and plotting of lots, the building of roads, and the extension of sewers, we conclude that the improved real estate was indeed the constructed property contemplated by the statute. *Jack Farber*, 36 T.C. 1142, 1156 (1961), affd. 312 F. 2d 729 (C.A. 2, 1963), certiorari denied 374 U.S. 828 (1963); *J. D. Abbott*, 28 T.C. 795, 805–806 (1957), affd. 258 F. 2d 537 (C.A. 3, 1958). Furthermore, considering the purpose for which Rayburn was formed, its actual sale of lots, and the terminology used to describe the real estate on its balance sheet, we have no doubt that the real estate owned by Rayburn was property held primarily for sale to customers in the ordinary course of Rayburn's business, which property is defined as "section 341 assets" by section 341(b)(3)(B).

The petitioner next contends that the sale of stock included within the intendment of section 341 must be to outside interests rather than to existing shareholders. Again he has presented no argument on this point except in his attempt to distinguish cases relied upon by the respondent. Without any indication of the petitioner's rationale in support of his position, we can only assume that this assertion is based on the following language in the Senate Finance Committee Report on the Revenue Act of 1950:

While the primary use made of collapsible corporations in the past has usually involved their liquidation * * * it is apparent that the shareholders forming or availing themselves of such a corporation could raise the same tax questions as would be raised by a liquidation *by selling their stock to outside interests* at the time and under the circumstances when the corporation might otherwise be liquidated. * * * [S. Rept. No. 2375, 81st Cong., 2d Sess., 1950–2 C.B. 483, 547. Emphasis supplied.]

We think the reasoning of *Carl B. Rechner*, 30 T.C. 186, 192–193 (1958), involving the same question but a different factual situation

and relied upon by the respondent, is equally applicable to the instant case. Section 341(a)(1) requires only that a sale of stock occur, and it places no requirement with respect to whom the stock must be sold. The transaction (the sale of stock) in the instant case falls precisely within the terms of the statute and we are bound to follow its clear language.

In his final contention that Rayburn was not a collapsible corporation, petitioner argues only that the operative view to sale of stock (prior to the realization by Rayburn of a substantial part of the taxable income to be derived from its real estate development) did not exist under the facts of the instant case. With this contention we agree.

The petitioner bases his argument primarily on *Commissioner v. Lowery*, 335 F. 2d 680 (C.A. 3, 1964), affirming 39 T.C. 959 (1963), and *Commissioner v. Solow*, 333 F. 2d 76 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court, both cases having been decided on the same rationale. In *Commissioner v. Lowery*, where the sale of stock was made prior to completion of construction, but under threat of financial ruin by one of the taxpayers' coshareholders, the court made the following comments (335 F. 2d at 684) with respect to the collapsible corporation provision in the 1939 Code:

> We are of the opinion that section 117(m) contemplates a freedom of choice in reaching a decision to sell stock in determining whether a shareholder had the "view" proscribed by the section, and that where a sale is compelled by circumstances beyond control the "view" does not exist.

In the instant case, the petitioner was invited by Time to become part of the management team of Rayburn and was sold a 50-percent stock interest in Rayburn. However, the petitioner was required to sign a unilateral option agreement granting Time the right to reacquire the petitioner's stock. The petitioner did not wish to grant Time such an option but, realizing his bargaining position on the point was minimal, he reluctantly agreed to do so. This is not a case where the two parties were of equal or near equal bargaining power, nor is it a case where there was collusion between or design by the two parties to compensate the petitioner in this manner. Nor was there any clandestine understanding between the parties with respect to a future resale by petitioner.

We have no doubt that petitioner intended his stock purchase to be a long-term investment. However, we think petitioner was as effectively without total control of his Rayburn stock, either at the time of the granting of the option or at the time of the exercise of the option, as was the taxpayer in *Commissioner v. Lowery* by reason of the realities of Time's bargaining position. After consideration of all the facts we

think it is clear that petitioner was compelled to sell by circumstances beyond his control.

The respondent has attempted to distinguish the cases relied upon by petitioner and bases his arguments primarily upon section 1.341-2 (a) (2) and (3), Income Tax Regs.[3]

The respondent first asserts that, under section 1.341-2(a) (2), Income Tax Regs., the petitioner was in a position to determine Rayburn's policies and consequently his view should control. Apart from the fact that we have concluded that the factual circumstances negated any proscribed view on the petitioner's part, we do not think that petitioner determined the policy of Rayburn. While it is true that petitioner was, at the outset, a 50-percent shareholder, so was the victorious taxpayer in *Commissioner* v. *Solow, supra.* It is also true that petitioner participated in Rayburn's policy determination as president and general manager, but in light of the leverage which Time held over petitioner and the fact that a 50-percent interest is not a majority, we cannot say that petitioner controlled the policy of Rayburn by his "owning a majority of the voting stock of the corporation or otherwise." It is evident that petitioner did not determine Rayburn's policies, for that is the precise reason why he no longer wished to continue in the project with its then-existing development policy.

---

[3] Sec. 1.341-2   Definitions.
(a) Determination of collapsible corporation.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(2) Under section 341(b)(1) the corporation must be formed or availed of with a view to the action therein described, that is, the sale or exchange of its stock by its shareholders, or a distribution to them prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and the realization by the shareholders of gain attributable to such property. This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated, unconditionally, conditionally, or as a recognized possibility. If the corporation was so formed or availed of, it is immaterial that a particular shareholder was not a shareholder at the time of the manufacture, construction, production, or purchase of the property, or if a shareholder at such time, did not share in such view. Any gain of such a shareholder on his stock in the corporation shall be treated in the same manner as gain of a shareholder who did share in such view. The existence of a bona fide business reason for doing business in the corporate form does not, by itself, negate the fact that the corporation may also have been formed or availed of with a view to the action described in section 341(b).

(3) A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling facts to the contrary, be considered to have been so formed or availed of.

The respondent next argues that Time, as the controlling shareholder, had the proscribed view, which view would be deemed that of the petitioner whether or not he shared it. Such contention is unclear since Time never sold its stock but continued to operate Rayburn. If such assertion is based upon the argument that Time intended all along to buy the petitioner out we find it unsupported by the record. There was no evidence showing, at least until the disagreements arose, that Time did not intend to keep the petitioner as general manager of the project. Further, we are unwilling to infer such an intent from the fact that petitioner only invested $50,000 while he projected a gross profit potential of approximately $15 million.

The respondent attempts to distinguish the instant case from those relied upon by petitioner on the basis that the circumstances causing the sales in *Commissioner* v. *Lowery*, *supra*, and *Commissioner* v. *Solow*, *supra*, were unforeseen whereas one of the reasons Time demanded the unilateral option here was in case of its disagreement with the petitioner. Respondent contends that the sale, or the exercise of the option on account of disagreement, was an anticipated event or a "recognized possibility." However, at the outset, the relations between Time and petitioner were amicable and Time was apparently impressed with petitioner's work on the feasibility study and his ideas for development of the property. There was no reason then to believe that there would be disagreement. Furthermore, one of the principal officers of Time, with whom the petitioner negotiated, indicated Time did not intend to exercise the option although he could not give any guarantee to that effect.

We do not think that the term "recognized possibility" includes any possibility and, as we think is the case here, certainly not a remote possibility or contingency. While the words "recognized possibility" are supposed to interpret the meaning of the term "with a view to," we note that in its everyday sense the latter term connotes "purpose" or "aim." See Webster's Third New International Dictionary (15th ed. 1969). In all situations there are possibilities of disagreement. The fact that a prudent businessman or a careful lawyer tries to take into account every contingency does not mean that he equates every contingency with a "recognized possibility." In this case, considering the circumstances at the time of the granting of the unilateral option, we think the exercise of that option was then only a remote possibility and was not to be expected.

In the instant case the petitioner sold his stock prior to completion of construction, as did the taxpayer in *Commissioner* v. *Lowery*, *supra*, and he may have, in part, precipitated the exercise of the option by Time through his letter of August 18, 1966. At that time petitioner may well have recognized as a possibility that Time might purchase

his stock, and conversely that he might sell it. However, we think that the changed and not reasonably foreseeable circumstances of the situation, including petitioner's attempt to gain control of the development policy after disagreement thereover, his offer to buy Time's interest in Rayburn as a preferred alternative, and his effective lack of free choice, present compelling facts to negate any view to sell as contemplated by the statute. Sec. 1.341–2(a)(3), Income Tax Regs. Cf. *Shilowitz* v. *United States*, 221 F. Supp. 179, 183–184 (D. N.J. 1963).

In the instant case, the petitioner had no real alternative other than writing the August letter if the project was to be developed as he thought proper and the disagreement in policy resolved. To say that the sale of stock and the circumstances surrounding it were compelled by petitioner rather than being beyond his control so as to give him no real alternative misses the point. We note also that the court in *Commissioner* v. *Lowery* was apparently unconcerned that the sale of Parkway House, Inc., stock there occurred during construction.

Since we have determined that the proscribed view was not present, we conclude that Rayburn was not a collapsible corporation within the meaning of section 341. Accordingly, the petitioner is entitled to long-term capital gain treatment on his sale of Rayburn stock.

*Decision will be entered for the petitioners.*