EDWARD S. ZORN and ROSETTA ZORN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Zorn v. Commissioner
Docket Nos. 3629-73, 3690-73, 3691-73, 3692-73, and 3693-73.
United States Tax Court
T.C. Memo 1976-241; 1976 Tax Ct. Memo LEXIS 163; 35 T.C.M. (CCH) 1048; T.C.M. (RIA) 760241; August 4, 1976, Filed Alan M. Stark, for the petitioners in docket Nos. 3629-73 and 3690-73. Donald Horowitz, for the petitioners in docket Nos. 3691-73--3693-73. Kenneth G. Gordon, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: In these consolidated cases, respondent has determined deficiencies in income taxes as follows: Petitioners
Docket No.
Year
Deficiency
Edward S. and
3629-73
1966
$17,730.99
Rosetta Zorn
Richard I. and
3690-73
1966
13,262.27
Nancy Zorn
Samuel J. and
Beverly Jackman
3691-73
1966
14,085.73
1967
2,116.00
Lawrence and
3692-73
1964
662.17
Susan Jackman
1965
1,000.91
Lawrence and
3693-73
1966
8,418.01
Susan Jackman
*164 Concessions having been made, the sole issue remaining before us is whether Regency Corporation was a collapsible corporation within the meaning of section 341(b). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Edward S. and Rosetta Zorn were husband and wife who resided at Fort Lee, New Jersey, at the time the petition was filed. They filed their Federal income tax returns for 1966 and 1967 jointly. Petitioners Richard I. and Nancy Zorn were husband and wife who jointly filed their Federal income tax returns for 1966 and 1967. At the time the petition was filed, Richard I. Zorn resided at Tenafly, New Jersey, and Nancy Zorn resided at New York, New York. Petitioners Samuel J. and Beverly Jackman were husband and wife who resided at New York, New York, at the time the petition was filed. They jointly filed their 1966 and 1967 Federal income tax returns. Petitioners Lawrence and Susan Jackman were husband and wife who jointly filed their Federal income tax returns for 1964, 1965, 1966, and 1967. At the time the petitions *165 in docket Nos. 3692-73 and 3693-73 were filed, Lawrence Jackman resided at Orlando, Florida, and Susan Jackman resided at Fort Lee, New Jersey. On May 10, 1963, Richard I. Zorn (Richard) and Lawrence J. Jackman (Lawrence) entered into a contract to purchase a certain parcel of land in the Borough of Ramsey, New Jersey. The consideration for the purchase was as follows: Funds in escrow account
$ 8,000
Cashier's check
38,000
Assumption of first mortgage
33,750
Purchase money second mortgage
79,250
$159,000
On August 9, 1963, a mortgage commitment of $1,350,000 was obtained from the Carteret Savings and Loan Association in the name of Regency Corporation. The commitment expired on February 15, 1965. The loan was to be secured by a valid first mortgage lien on apartment buildings to be constructed on the parcel of land purchased by Richard and Lawrence. On August 13, 1963, Regency Corporation (Regency) was formed under the laws of New Jersey. The 40 shares of outstanding capital stock of Regency on the date of incorporation were owned as follows: Edward S. Zorn
10 shares
Richard I. Zorn
10 shares
Lawrence J. Jackman
10 shares
Samuel J. Jackman
10 shares
40 shares
*166 Each shareholder of Regency had a basis of $5,000 in the stock on August 13, 1963. On January 11, 1967, Edward S. Zorn transferred his 10 shares in Regency to his wife Rosetta. Regency was organized principally to acquire land and to construct, own and operate a garden type apartment development in the Borough of Ramsey, New Jersey. From August 13, 1963 through February 29, 1964, Regency filed its Federal income tax return (Form 1120-S) pursuant to the provisions of subchapter S of the Code. For its fiscal years ending February 28, 1965, 1966, 1967 and 1968, Regency filed a corporate income tax return (Form 1120). On August 20, 1963, Regency's board of directors met and resolved to assume by assignment Richard's and Lawrence's contract to purchase land in the Borough of Ramsey, New Jersey. Richard and Lawrence had the primary responsibilities in management of Regency and were in a position to determine the policies of Regency. On November 13, 1963, Peoples Trust Company of Bergen County (Peoples) agreed to lend Regency $1,350,000 as an installment construction loan. Regency's indebtedness to Peoples was evidenced by a note due January 15, 1965. The aggregate amount *167 advanced to Regency by Peoples through March 18, 1965, was $1,109,500. On January 18, 1965, Regency obtained a mortgage commitment for which it had applied in December 1964, from Dime Savings Bank of Brooklyn (Dime) in the amount of $1,480,000. On May 19, 1965, Regency exercised its commitment from Dime and utilized the funds as follows: Payment to Peoples
$1,109,500.00
Balance due on second mortgage
72,000.00
Escrow Fund
5,000.00
Interest charges
3,620.86
Total Payments
$1,190,120.86
Net proceeds deposited into
corporate bank account on
May 20, 1965
289,879.14
$1,480,000.00
The construction of the apartments was completed by May 20, 1965, but not before February 23, 1965. The apartments were constructed in four groups; the certificate of occupancy for Group I issued from the Borough of Ramsey on May 28, 1964; the certificate of occupancy for Groups II, III and IV issued on February 23, 1965. The cost basis of the buildings as of March 1, 1965, excluding accumulated depreciation, was $1,136,038.80. As of February 28, 1966, the cost basis of the buildings was $1,243,045.82. The increase in basis from March 1, 1965 to February 28, 1966, was attributable *168 solely to work performed prior to May 20, 1965. Regency reported rental income from the apartments on its tax returns for its fiscal years ended February 28, 1966, 1967, and 1968, respectively, as follows: 1965 Return
1966 Return
1967 Return
$259,000
$279,000
$285,000 For advertising its apartments during its fiscal years ended February 28, 1966, 1967 and 1968, Regency expended the sums of $2,074.05, $214.76, and $73.66, respectively. During the same years, Regency paid rental commissions of $105, $1,367.75, and $1,012.50, respectively. Regency also paid in interest during these years the sums of $81,409.49, $83,430.71, and $82,486.26, respectively. Regency reported a net loss of $12,125.18 on its Form 1120-S for the period August 13, 1963 through February 29, 1964, which was deducted pro rata by Regency's four stockholders on their individual 1964 tax returns pursuant to section 1374. As of March 1, 1965, after taking into account each stockholder's pro-rata share of Regency's net operating loss, the basis of each shareholder's Regency stock was as follows: Shareholder
Basis
Edward S. Zorn
$1,968.71
Richard I. Zorn
1,968.70
Samuel J. Jackman
1,968.71
Lawrence J. Jackman
1,968.70
*169 During each of the calendar years 1966 and 1967, Regency distributed amounts totaling $208,000 and $48,000, respectively, to its shareholders. Of the $208,000 distributed in 1966, $148,000 was distributed in January or February. Regency had earnings available for dividend distribution in the amounts of $13,890 in 1966, and $10,516.07 in 1967. Each shareholder of Regency had dividend income of $3,472.50 in 1966, and $2,629.02 in 1967. After taking into account those distributions in 1966 and 1967 qualifying as dividend income to Regency's shareholders, each shareholder received distributions in excess of his Regency stock basis as follows: Shareholder
1966
1967
Edward S. Zorn
$46,558.79
$9,370.98
Richard I. Zorn
46,558.80
9,370.98
Samuel J. Jackman
46,558.79
9,370.98
Lawrence J. Jackman
46,558.80
9,370.98
Throughout the years involved adjustments to Regency's earned surplus were made due to net losses, net income, or distributions to shareholders as follows: Amount of Fiscal Year Ending
Adjustment
Adjustment
Balance
February 27, 1964
Loss (Subchapter S)
[ 12,125.18)
[ 12,125.18)
February 28, 1965
Loss
( 14,514.43)
( 26,639.61)
February 28, 1966
Loss
( 12,723.29)
(39,362.90)
February 28, 1966
Distribution in Ex-
cess of Capital Stock
148,000.00
(187,362.90)
February 28, 1967
Net Income *
16,667.99
(170,694.91)
February 28, 1967
Distribution in Ex-
cess of Capital Stock
48,000.00
(218,694.91)
February 28, 1968
Net Income **
9,285.69
(209,409.22)
February 28, 1968
Distribution in Ex-
cess of Capital Stock
48,000.00
(257,409.22)
*170 No plans, designs, applications or other documents seeking permission to construct recreational facilities or a swimming pool for Regency's apartments were ever filed with local authorities. A two-inch copper pipe for carrying water was installed, running underground from the apartment complex to an excavated, flat area adjacent to parking spaces outside of the congregation of apartment buildings. The Borough of Ramsey, New Jersey, constructed a municipal swimming pool which was opened for use on July 20, 1964. Dime's mortgage commitment of $1,480,000, given to Regency on January 18, 1965, was subject to, inter alia, the installation of sidewalks and curbs. The required curbs and sidewalks were installed prior to May 19, 1965. Regency's sewage treatment plant was functioning satisfactorily by the time the construction was completed in May 1965. Because of *171 a minor sudsing problem with Regency's sewage treatment in the fall of 1965, Regency spent approximately $5,000 correcting the problem. OPINION The sole issue remaining before us is whether Regency was a collapsible corporation within the meaning of section 341 because of having been "formed or availed of principally for the * * * construction * * * of property" with the view prohibited by section 341(b)(1). [3] The parties are agreed that Regency was availed of to construct property and that the distributions were made prior to Regency's realization of a substantial part of the taxable income to be derived from the constructed property. *172 If those in a position to determine the policies of Regency had contemplated, prior to full completion of construction, "unconditionally, conditionally or as a recognized possibility" a distribution to shareholders prior to Regency's realization of a substantial part of the taxable income to be derived from the constructed property, then Regency is a collapsible corporation. Sec. 1.341-2(a)(2), Income Tax Regs.; Edward Weil,28 T.C. 809 (1957), affd. per curiam, 252 F. 2d 805 (2d Cir. 1958). Petitioners concede this point, but argue that no distribution was contemplated even as a recognized possibility until after construction was completed. They argue that the distributions were made possible by circumstances that arose solely after construction was completed and rely on Jacobson v. Commissioner,281 F. 2d 703 (3d Cir. 1960), revg. 32 T.C. 893 (1959). See also, Maxwell Temkin,35 T.C. 906 (1961), Joseph M. Crowe,62 T.C. 121 (1974). Petitioners contend that certain large, anticipated expenses never materialized and that it was only after these expenses had been fortuitously avoided *173 that Regency first contemplated making the distributions. [4] Upon a careful review of the record, we find that the distributions were contemplated as a recognized possibility before construction was completed and, therefore, Jacobson v. Commissioner,supra, is not in point. See, Sproul Realty Co.,38 T.C. 844 (1962). Regency received its mortgage loan from Dime in the amount of $1,480,000 on May 19, 1965. Regency deposited unused mortgage proceeds in the amount of $289,879.14 into its bank account on May 20, 1965. Petitioners suggest that these excess mortgage funds were necessary to absorb anticipated expenses in the total amount of $282,000 estimated by Richard Zorn as follows: $6,000 for advertising, $13,000 for brokers' commissions, $38,000 for installation of sidewalks and curbs, $100,000 for enclosing and piping a stream that *174 ran across Regency's property, $25,000 for repairs to the sewage treatment plant and $100,000 for work related to the installation of a swimming pool and recreational facilities. Respondent maintains that the petitioners knew when they exercised the mortgage commitment from Dime that Regency would not be undertaking any further large capital outlays, and that Regency then recognized the possibility that it could make the distributions to petitioners. We think the record supports respondent's analysis. It appears to us that Regency's rental income of $259,000 in its fiscal year ended February 28, 1966, was more than sufficient to cover all current expenses, including Regency's advertising and commission expenses which together totaled only $2,179.05 that year. Regency's rental income in its fiscal year ended February 28, 1966, did not vary significantly from its rental income of $279,000 and $285,000 in its fiscal years ended in 1967 and 1968, respectively. This leads us to disbelieve Richard's testimony that the apartments were rented out fully only by some ill-defined time in 1966, the time at which, Richard testified, Regency did not need the excess mortgage funds and decided *175 to make the distributions. We think that the excess mortgage funds were seen by those in a position to control Regency's policies (i.e. Richard Zorn and Lawrence Jackman) as the financial cushion which would allow Regency to make the cash distributions in calendar years 1966 and 1967 without endangering its fiscal soundness ($148,000 of the distributions was made in January or February 1966). The approximately $107,000 increase in Regency's basis in the apartments from March 1, 1965 to February 28, 1966, was attributable solely to work performed prior to May 20, 1965. Any sidewalks and curbs which Regency was required to install were in place by May 19, 1965. Their installation was a condition to which Regency's exercise of Dime's mortgage commitment was subject. It appears to us from Lawrence Jackman's testimony that Richard's $38,000 cost projection for sidewalks and curbs was really a local government project, the expense of which was to be borne by the Borough of Ramsey. Richard's testimony regarding the $100,000 cost of enclosing the stream was vague, and we conclude that the Borough's demands for enclosure had been overruled by higher county authorities prior to completion *176 of construction. Regarding the sewage treatment plant, Richard testified that it "got the job done" prior to May 1965. The only post construction expense for plant repairs was $5,000 spent in the fall of 1965. We think that Regency anticipated spending no more than the amount actually incurred. Petitioners make much of Regency's "hard plans" to install a swimming pool and recreational facilities to show that the excess mortgage funds secured by the constructed property were not taken with a view toward distribution. It is clear that Regency had at one time contemplated constructing a swimming pool because a pool appeared on an early, preliminary site grading plan dated March 14, 1963. However, we think Regency abandoned its plans for the pool and recreational facilities prior to completion of construction. The record demonstrates that any plans for a pool were too tenuous to be given recognition as a post-construction project anticipated by Regency. In their petitions to this Court, petitioners alleged that it was the advent of the municipal recreational facilities that caused Regency to abandon its plans for its own pool. Yet, the Borough's swimming pool was opened for *177 use on July 20, 1964. No plans or designs regarding the final construction site contain any reference to recreational facilities. No applications or other documents seeking permission to install a pool were ever filed with local authorities. Richard testified that sketches were drawn up, but none appear in the record. Although a water line was put in that ran to a flat, excavated area, we are not satisifed that its sole use was for a pool or, even if it were, we think that it had been installed long before construction had been completed. In summary, petitioners have failed to convince us that Regency did not have a view toward distribution when it was availed of for constructing the apartments. The excess mortgage proceeds of $289,879.14, secured by the constructed apartments, were intended by Regency to provide the financial cushion for later distributions to its shareholders. Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Richard I. Zorn and Nancy Zorn, docket No. 3690-73; Samuel J. Jackman and Beverly Jackman, docket No. 3691-73; Lawrence Jackman and Susan Jackman, docket No. 3692-73; and Lawrence Jackman and Susan Jackman, docket No. 3693-73.↩
2. Unless otherwise indicated all statutory references are to the Internal Revenue Code of 1954.↩
*. At the close of calendar year 1966 Regency had earnings available for dividends in the amount of $13,890 or $3,472.50 applicable to each shareholder. ↩
**. At the close of calendar year 1967 Regency had earnings available for dividends in the amount of $10,516.07 or $2,629.02 applicable to each stockholder.↩
3. SEC. 341.COLLAPSIBLE CORPORATIONS. * * *
(b) Definitions.-- (1) Collapsible corporation.--For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the * * * construction * * * of property * * * with a view to-- (A) * * * a distribution to its shareholders, before the realization by the corporation * * * constructing * * * the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property.↩
4. Petitioners argued at trial that the distributions from Regency were really "loans" which they intended to pay back. There is no credible evidence in the record to support this position. Moreover, petitioners seem to have abandoned this theory on brief and, therefore, are deemed to have conceded it.↩