PETER G. FELIX and ANGIE P. FELIX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Felix v. Commissioner
Docket No. 4138-78.
United States Tax Court
T.C. Memo 1981-99; 1981 Tax Ct. Memo LEXIS 645; 41 T.C.M. (CCH) 1040; T.C.M. (RIA) 81099; March 2, 1981. Francis X. McCormick and John R. Blasi, for the petitioners. Bernard Wishnia, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined a deficiency of $ 13,467.22 in petitioners' Federal income tax for 1971. After concessions, the only issue presented is whether two corporations whose stock was sold by petitioner were collapsible corporations within the meaning of section 341. [1]
FINDINGS OF FACT Some of the facts were stipulated and are so found. Petitioners Peter G. Felix and Angie P. Felix, husband and wife, resided in Meyersville, N.J., when they filed their petition in this case. Peter G. Felix (hereinafter petitioner) came to this country from Greece in 1952 and has been working in various capacities in the restaurant and diner business since 1955. This case is all about diners. Petitioner's first experience as a diner owner-operator came in 1962. In that year *647 petitioner and three other individuals each contributed $ 7,500 to become equal shareholders in Bayway diner & Restaurant, Inc. (Bayway). The Fodero Dining Car Co. (Fodero (Dining) built Bayway a diner which was installed and operated in Elizabeth, N.J. However, by 1963 petitioner's relationship with the other shareholders had turned sour, and they voted him out of the corporation. Petitioner was bought out for his original investment after working for months as a dishwasher at $ 50 per week. In January 1965 petitioner, his wife Angie (Angie), and his father-in-law George Cassotis (Cassotis) incorporated Golden Dream Diner, Inc. (Golden Dream). Petitioner contributed $ 20,000 and Cassotis $ 10,000. They leased a lot in Plainfield, N.J., and had Fodero Dining build them in diner. The Fodero Dining Car is a prefabricated modular unit which is simply dropped into place once the site is paved and the foundation completed. Thereafter the diner's refrigration equipment, air conditioning, plumbing, and so forth can all be installed in a relatively short time. Petitioner supervised this construction following delivery of Golden Dream's diner. Things went well until 1967, when a *648 dispute erupted concernings the extent of Cassotis's interest in Golden Dream. Cassotis claimed to be a 50 percent shareholder while petitioner maintained Cassotis owned only 33 percent. Cassotis filed suit in May 1967. In response, petitioner offered either to buy out Cassotis or to give him 50 percent of Golden Dream on the condition they sell the corporation immediately. Cassotis refused both offers and continued his lawsuit. Petitioner finally decided the only way to avoid further shareholder disputes was to strike out on his own. Without Cassotis's knowledge, petitioner negotiated a ground lease for another diner site in New Providence, N.J., in September 1967. A contract with Fodero Dinning was signed in October, and in November 1967 Prestige Diner, Inc. (Prestige) was incorporated with petitioner as the sole shareholder. [2]
*649 Cassotis learned about the Prestige Diner when it was nearing completion. Petitioner told Cassotis he could henceforth operate the Golden Dream Diner himself. Not willing to face that prospect, Cassotis finally acquiesced in a sale. Thus, in January 1968 all of the stock of Golden Dream was sold to Chris Maglaras (Maglaras) for $ 195,040 on an installment basis. The sales contract guaranteed gross receipts for the first two weeks in February of $ 9,000, "under normal weather conditions." Petitioner and Cassotis split the proceeds as 50 percent shareholders, and petitioner thought his troubles with his father-in-law had been settled. The Prestige Diner opened for business in March or April of 1968. Petitioner worked long hours, seven days a week to establish the diner. In early July 1968, Angie told petitioner Cassotis was continuing the lawsuit and demanding a 50 percent interest in Prestige. Family disharmony ensued. Petitioner moved out of the house of into the diner, and he told Angie that because Cassotis was her father she would have to deal with him. Angie failed to resolve matters with her father. Instead, Angie got petitioner to agree to sell the new diner so *650 they could move back to Greece and save their marriage. Petitioner told a number of the tradesmen serving the diner he had decided to sell out, and an ice cream dealer named "Happy" came up with a buyer almost immediately. On August 5, 1968, all of Prestige's stock was sold to James Gianitsas (Gianitsas) for $ 254,240. Biweekly gross receipts of $ 13,000 were guaranteed. Originally, the sales contract called for $ 30,000 in cash at the closing and the balance in installment notes, but at the last minute Gianitsas could not come up with enough cash. Petitioner ended up agreeing to take $ 8,500 in cash most of which came out of the diner's current receipts, to let Gianitsas assume additional corporate liabilities, and to accept additional notes for the balance. On August 6, 1968, petitioner, Angie, and their two children left for Greece. The children were enrolled in Greek schools. In late 1968 Maglaras, the purchaser of Golden Dream, defaulted on his obligations to petitioner and Cassotis, Fodero Dining, the landowners, and others. The stock of Golden Dream reverted to petitioner and Cassotis. Accordingly petitioner, who was still personally liable for many of Golden Dream's *651 debts, flew back to the United States in February 1969 to salvage what he could. When all was said and done, the lawsuits (at least three by that time) between petitioner, Cassotis, and Golden Dream's creditors had been settled; petitioner had agreed to buy Cassotis's 50 percent interest in Golden Dream for $ 35,000; and petitioner had repurchased the Golden Dream Diner at its foreclosure sale and then resold the diner that same day to Theodoro Silverdis. Petitioner wrote the contract of sale himself in longhand. When petitioner rejoined his family in Greece, he found himself somewhat overextended. Although his financial situation looked good on paper, his obligations to Cassotis coupled with the credit he had extended to Gianitsas and Theodoro Silverdis made his cash flow very poor. All his income was going to pay his obligations. Petitioner and Angie returned to the United States in the spring of 1970. By this time petitioner was well-experienced in building, operating, and selling diners. Fodero Dining's chief officer suggested a site in Millburn, N.J., and offered to build petitioner a diner with no money down. Using a corporation because of local usury laws petitioner *652 brought the land in Millburn outright in June, and things proceeded much as they had with petitioner's other diners. Millburn Restaurant, Inc., wholly owned by petitioner, was incorporated July 16, 1970. The Millburn Restaurant opened in mid-November. Petitioner worked long hours for low wages to get the new business started. On February 10, 1971, petitioner agreed to sell all of Millburn's stock to four individuals for $ 375,000 and to lease them the site. The contract guaranteed biweekly gross receipts of $ 17,000. Petitioner testified he made the sale because he was exasperated on a heavy snow day. According to petitioner, an accountant named Theodore Houlis had been stopping by the diner once or twice a week since early January asking if the diner was for sale. Petitioner steadfastly refused all such entreaties. During a heavy snowstorm, however, few of petitioner's waitresses showed up and the diner, which was across the street from a train station, was jammed with customers. Theodore Houlis came in, and, in a melancholy state, petitioner told Houlis he was read to sell. Somewhat inconsistently, petitioner testified both that the offer he received was extraordinary *653 and too good to turn down and that within a month and a half after the sale he had changed his mind and, at Angie'e insistence, offered to repurchase the diner for $ 20,000 more than the original sales price. Later in 1971 petitioner contracted to have Fodero Dining build him another diner for a second site he had purchased. This diner was sold to a four-man corporation as soon as it was installed on the site. Petitioner's only involvement in the diner's operation was as the landlord and the initial contractor. The buyers' Shareholders Agreement, however, gave petitioner the right to handle all negotiations in the event the buyers later wanted to sell. On petitioner's 1971 Federal income tax return, he listed his trade or business as "construction" and his product as "diner-restaurant." In his statutory notice respondent determined that both Prestige and Millburn were collapsible corporations and that, accordingly, petitioner's gain from the sale of his stock in each of those corporations was ordinary income. The 1968 Prestige sale is in controversy because petitioner received installment payments therefrom in the year in issue. OPINION The issue presented is whether *654 Prestige, Millburn, or both were collapsible corporations as that term is defined in section 341. In each case, the only question is whether petitioner had the "view" required by section 341(b)(1). Section 341 is aimed at preventing taxpayers from transmuting what would otherwise be ordinary income into long-term capital gain through the device of a temporary corporation. Typically, such a corporation is formed to make a single motion picture or to build one apartment building. Corporate salaries or other distributions are kept as low as possible. Often, the enterprise is heavily debt-financed. Once the project is complete and its worth in the marketplace is determinable, the shareholders sell their stock (the "collapse") for substantial gains, all of which will hopefully be taxed at the favorable rates for long-term capital gains. See generally Commissioner v. Kelley,293 F.2d 904 (5th Cir. 1961); Burge v. Commissioner,253 F.2d 765 (4th Cir. 1958). To combat this perceived abuse of the capital gains provisions, section 341(a)[3] treats gain from the sale or exchange of stock in a collapsible corporation as ordinary income to the extent *655 it would otherwise be long-term capital gain. The trigger mechanism and the key to section 341 is the definition of "collapsible corporation" in section 341(b)(1): (b) Definitions.-- (1) Collapsible corporation.--For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to-- (A) the sale or exchange of stock *656 by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. [Emphasis added.] Many elements of the above definition are clearly satisfied here. Both Prestige and Millburn were formed for the construction and operation of diners. The gain inherent in each completed diner was realized by petitioner through the sale of his stock before any significant profits were realized by the corporations. Thus, we must decide whether petitioner intended this result all along, that is, whether petitioner had the requisite "view" toward such a sale of his shares when the diners were being built. Th is is an inherently subjective inquiry which depends upon the facts and circumstances of each case. Sec. 1.341-5(a), Income Tax Regs. See Crowe v. Commissioner,62 T.C. 121 (1974). It is a question on which petitioner bears the burden of proof. *657 Welch v. Helvering,290 U.S. 111 (1933); Riley v. Commissioner,35 T.C. 848, 858 (1961). [4]
A corporation is collapsible in the prohibited view is present at any time before construction of the property in issue, herein each diner, is complete. Sec. 1.341-2(a)(3) and (4), Income Tax Regs.; Computer Sciences Corp. v. Commissioner,63 T.C. 327 (1974); Tibbals v. United States,176 Ct. Cl. 196, 362 F.2d 266 (1966). *658 The extent of the view to collapse required is defined by the regulations as follows: "The requirement is satisfied whether such action [the stock sale] was contemplated, unconditionally, conditionally, or as a recognized possibility." Sec. 1.341-2(a)(2), Income Tax Regs. This broad construction of the statute has generally been adopted by the courts. See August v. Commissioner,267 F.2d 829 (3d Cir. 1959), affg. 30 T.C. 969 (1958); Estate of Diecks v. Commissioner,65 T.C. 117 (1975). Compare Crowe v. Commissioner,supra.Thus, to prevail petitioner must show he had not considered selling the stock in question prior to the diner becoming operational. This is a very difficult proof, and both the regulations and the cases provide one easier path to taxpayer success. Section 1.341-2(a)(3) of the regulations provides: [I]f the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances *659 which reasonably could be anticipated at the time of such manufacture, construction, production or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. Thus, if petitioner can in each case show that unanticipated circumstances (and not the "bad view") were what caused the sale of his stock, neither corporation will be found to have been collapsible. See Commissioner v. Solow,333 F.2d 76 (2d Cir. 1964) (threats of financial ruin following shareholder disagreement); Jacobson v. Commissioner,281 F.2d 703 (3d Cir. 1960) (damage to property); Crowe v. Commissioner,supra (shareholder disagreement); Temkin v. Commissioner,35 T.C. 906 (1961) (second heart attack). Such "forced sales" are precisely what petitioner has tried to show herein. Respondent's argument is primarily circumstantial. See sec. 1.341-5(b), Income Tax Regs. He contends both Prestige and Millburn were classic collapsible corporations. In each case, all the stock of a single-enterprise corporation was sold for a substantial *660 gain between six and ten months after incorporation. Petitioner worked long hours to establish each business and was paid very little. Each diner was operated for less than four months prior to sale. Respondent also contends petitioner was not a credible witness. Petitioner maintains he never contemplated selling either Prestige or Millburn when their diners were under construction. More to the point, petitioner argues that unforeseen special circumstances were responsible for the sale of each corporation, a factor which will ordinarily forestall collapsible treatment. Petitioner contends that Prestige was sold to save his marriage and to avoid further disputes with his father-in-law. He contends that Millburn was sold because he became depressed about the diner business during a snowstorm when no help showed up and because he was offered an exceptional price. We find that Millburn was a collapsible corporation and that Prestige was not. Our conclusion is based on a careful consideration of the circumstances surrounding the construction period and subsequent sale in each case. Petitioner's testimony was inaccurate on several particular points, but on the whole we found *661 petitioner credible and the forthright. See generally Riley v. Commissioner,35 T.C. at 859. We find nothing in the record indicating petitioner ever considered selling Prestige while that diner was under construction during 1967-1968. Before the falling out with his father-in-law, petitioner had stayed with the Golden Dream Diner for about two years. All of the evidence shows petitioner's sole reason for building the Prestige Diner was finally to have a place of his own, free from disputes with other shareholders. The Prestige Diner had been ordered and was close to delivery before petitioner had sold his first diner corporation, Golden Dream. Having no prior experience in such sales, we do not see how an intent to sell Prestige can be imputed to petitioner. And after the sale of Golden Dream, petitioner had every reason to delibeve his family problems were over. Furthermore, the record affirmatively demonstrates Prestige was sold in August 1968 because Cassotis's renewed legal and other pressure was threatening petitioner's marriage. Cassotis's claims may have been groundless, but that made them no less disruptive. In relation to Prestige, these claims *662 were novel and unforeseeable. See Temkin v. Commissioner,supra.Petitioner's commitment to his family and the seriousness of the problems that led to the Prestige sale are evidenced by petitioner's return to Greece which his family the next day. Petitioner accepted a minimal downpayment where business prudence would have directed delay. In short, petitioner has proven to us Prestige was sold solely because of family problems that occurred after the diner had opened for business. Prestige's history falls well within the "unforeseen circumstances" exception to collapsibility. For the above reasons, we hold Prestige was not a collapsible corporation. However, we can only give petitioner one bite at the apple. After that, like Adam, petitioner knew what he was doing. By 1970, when the Millburn Restaurant was built petitioner had already installed and sold two diners himself and been associated with the construction of a third. Indeed, his experience and reputation in the industry were such that Fodero Dining was willing to build the Millburn diner on petitioner's signature without the customary deposit. In connection with Millburn, petitioner for the *663 first time bought rather than leased the underlying land. This factor alone suggests petitioner's activities were more those of an investor than an operator. Moreover, petitioner's ambiguous role in 1970 as both a builder as an operator was completely clarified by 1971. In 1971 petitioner ordered and installed another Federo diner strictly as a seller on a second site he owned. On his 1971 tax return petitioner stated his business was building diners. We recognize that petitioner's state of mind in 1970, not 1971, is at issue. But we think his 1971 activities only confirm what were at least prospects when the Millburn diner was built in 1970. All in all, we find that the sale of petitioner's Millburn stock once the diner was operational was a viable option is not a strong possibility from the outset. Either of those characterizations describes enough of a "view" to make Millburn collapsible. Petitioner, however, maintains that Millburn was sold because the price was extraordinary, an opportunity he could not turn down and a possibility he could not have foreseen. This argument is refuted by the record. The stock of Millburn was sold for $ 375,000, and the contract of sale *664 guaranteed receipts over a two week period of $ 17,000. The purchase price to biweekly receipts ratio was thus 22.0. In he case of Prestige this ratio was 19.6, and for Golden Dream 21.7. None of these ratios is extraordinary in relation to the others. The Millburn diner was worth more than the other two because it was larger, and petitioner was aware of this fact when he built the diner. We also hold that neither petitioner's susceptibility to extreme emotions nor February snowstorms in New Jersey constitute the kind of unforeseeable change in circumstances for which the cases make exception. Compare Commissioner v. Lowery,335 F.2d 680 (3d Cir. 1964). Millburn was a collapsible corporation. Accordingly, petitioner must treat his gain from the sale of his Millburn stock as ordinary income. To reflect concessions and the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. The record is unclear as to whether petitioner was the sole owner of Prestige or whether Angie owned half the stock. The difference will not affect the outcome, however, as petitioner and Angie filed joint returns for the year in issue. For convenience we shall refer to petitioner as the sole shareholder, but we need not and do not decide this question. The same uncertainty exists with respect to the stock of Millburn Restaurant, Inc., which we shall treat in the same way.↩
3. SEC. 341. COLLAPSIBLE CORPORATIONS. (a) Treatment of Gain to Shareholders.--Gain from-- (1) the sale or exchange of stock of a collapsible corporation. To the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.↩
4. interestingly, the "extra" presumption of sec. 341(c) does not apply in either case because the "section 341 assets" do not constitute 50 percent or more of the total corporate assets. The diners are not "section 341 assets" because they fall within the exception in sec. 341(b)(3)(D)↩. Nevertheless, petitioner bears his normal burden of proof because 341(c) also states, "Absence of the conditions described in [this subsection] shall not give rise to a presumption that the corporation was not a collapsible corporation." See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 12.05, at 12-20 n. 43 (4th ed. 1979).